

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FILED

MAY 22 2023

JUDGE NANCY L. MALDONADO
U.S. DISTRICT COURT

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 20 CR 750-2 |
| v. | |
| MARKO NIKOLIC | Judge Nancy L. Maldonado |

## PLEA AGREEMENT

1.    This Plea Agreement between the Acting United States Attorney for the Northern District of Illinois, MORRIS PASQUAL, and defendant MARKO NIKOLIC, and his attorneys, MICHAEL P. GILLESPIE and MICHAEL D. KREJCI, is made pursuant to Rule 11 of the Federal Rules of Criminal Procedure and is governed in part by Rule 11(c)(1)(A), as more fully set forth below. The parties to this Agreement have agreed upon the following:

### Charges in This Case

2.    The superseding indictment in this case charges defendant with wire fraud, in violation of Title 18, United States Code, Section 1343 (Counts 8 and 12); money laundering, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i) (Count 23); and international money laundering, in violation of Title 18, United States Code, Section 1956(a)(2)(B)(i) (Count 32).

3.    Defendant has read the charges against him contained in the superseding indictment, and those charges have been fully explained to him by his attorney.

4.      Defendant fully understands the nature and elements of the crimes with which he has been charged.

### Charges to Which Defendant Is Pleading Guilty

5.      By this Plea Agreement, defendant agrees to enter a voluntary plea of guilty to the following counts of the superseding indictment: Count 8, which charges defendant with wire fraud, in violation of Title 18, United States Code, Section 1343; and Count 32, which charges defendant with international money laundering, in violation of Title 18, United States Code, Section 1956(a)(2)(B)(i).  In addition, as further provided below, defendant agrees to the entry of a forfeiture money judgment.

### Factual Basis

6.      Defendant will plead guilty because he is in fact guilty of the charges contained in Counts 8 and 32 of the superseding indictment. In pleading guilty, defendant admits the following facts and that those facts establish his guilt beyond a reasonable doubt, and establish a basis for forfeiture of the property described elsewhere in this Plea Agreement:

a.      With respect to Count 8 of the superseding indictment:

Beginning in or around March 2020, and continuing through in or around September 2020, in the Northern District of Illinois, Eastern Division, and elsewhere, MARKO NIKOLIC, together with Maja Nikolic, Nebojsa Simeunovic, Mijajlo Stanisic, Branko Aleksic, Milica Sumakovic, Dorde Todorovic, and others, knowingly devised, intended to devise, and participated in a scheme to defraud and to obtain

2

money from the Economic Injury Disaster Loan Program by means of materially false and fraudulent pretenses, representations, and promises; and on or about June 29, 2020, for the purpose of executing the scheme, MARKO NIKOLIC knowingly caused to be transmitted by means of wire communication in interstate commerce certain writings, signs, and signals, namely, an interstate wire transmission of approximately $149,900, from the Federal Reserve Bank to a Food by Orange account maintained at Chase Bank, which funds represented the proceeds of an EIDL to Food by Orange, in violation of Title 18, United States Code, Section 1343.

MARKO NIKOLIC ("MARKO") acknowledges that the Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in March 2020 and designed to provide emergency financial assistance to the millions of Americans who were suffering the economic effects caused by the COVID-19 pandemic. MARKO further acknowledges that one source of relief provided by the CARES Act was the expansion of the EIDL program, which provided loan assistance (including advances of up to $10,000) for businesses with, among other things, 500 or fewer employees and other eligible entities. MARKO acknowledges that the EIDL program was designed to provide economic relief to small businesses that were experiencing a temporary loss of revenue.

MARKO knew that, to gain access to funds through the EIDL Program, small businesses applied through the U.S. Small Business Administration ("SBA") via an online portal and application. MARKO knew that the SBA required applicants to

3

submit truthful information about the applying entity, its owner, and its condition prior to the COVID-19 pandemic, including the entity's number of employees as of January 31, 2020; the entity's gross revenues and cost of goods sold for the 12-month period prior to January 31, 2020; the entity's type of business; and the date on which the current owner assumed ownership of the entity. MARKO understood that applicants who received EIDL proceeds were required to use those proceeds to pay an array of working capital and normal operating expenses, such as continuation of health care benefits, rent, utilities, and fixed debt payments. MARKO acknowledges that information about the EIDL applicants' business expenses and employees, and how the EIDL would be used, was material to the SBA's approval, terms, and funding of EIDL loans.

Between in or around March 2020 and September 2020, MARKO, Maja Nikolic, Nebojsa Simeunovic, Mijajlo Stanisic, Branko Aleksic, Milica Sumakovic, and Dorde Todorovic (the "co-schemers"), submitted and caused to be submitted over 300 applications for loans and advances under the EIDL Program on behalf of businesses and entities purportedly owned by the defendants and others, which applications contained materially false statements and misrepresentations concerning, among other things, the applicants' citizenship status and the purported entities' number of employees, revenues, expenses, type of business, and owners. In furtherance of this scheme, MARKO and his co-schemers paid for, and caused others to pay for, the reincorporation of previously dissolved companies ("shell companies");

4

identified themselves as and others as officers and agents of those companies in various state incorporation filings; and submitted, and caused others to submit, EIDL applications in which they falsely and fraudulently represented that the applicants assumed ownership and operation of those companies more than one year before the dates on which they paid to reincorporate the companies. As MARKO and his co-schemers knew, these shell companies were not in operation at the time they submitted these EIDL applications, the co-schemers did not own or have any relationship to these companies prior to the date they paid to reincorporate them; the former owners of the companies had not authorized them to reincorporate or assume responsibility for those companies; and the applicants did not qualify for any of the loan proceeds that they sought on behalf of those companies.

On or about March 30, 2020, MARKO and his sister, Maja Nikolic, prepared and submitted two EIDL applications for two different businesses that MARKO owned and operated, namely, I-Truck Logistics and BG Cargo. In these applications, MARKO falsely and fraudulently represented each company's number of employees (50 for I-Truck Logistics and 40 for BG Cargo), and gross revenues for the 12-month period preceding January 31, 2020 ($1,500,000 and $2,100,000, respectively). MARKO and Maja Nikolic knew at the time that I-Truck Logistics and BG Cargo did not employ the number of employees represented in the applications, nor had they earned the amounts of revenue stated in the applications.

As a result of these applications, on or about May 14, 2020 and May 12, 2020, MARKO caused the SBA to disburse EIDLs of approximately $149,900 for each of I-Truck Logistics and BG Cargo, respectively, into a bank account that he opened and controlled. MARKO knew at the time that neither he, I-Truck Logistics, nor BG Cargo was entitled to the EIDL funds, and that the information that he provided about each business's expenses and employees was material to the SBA's approval and funding of these EIDL loans.

By no later than April 2020, MARKO learned that Simeunovic, Maja Nikolic, and others were submitting additional EIDL applications for other businesses, including a business operated by Simeunovic in Oak Brook, Illinois, named "SIM Express." By no later than June 2020, Simeunovic agreed to pay MARKO money to recruit other client-applicants to give Simeunovic and Maja Nikolic their personal identifying information and to allow Simeunovic and Maja Nikolic to prepare and submit false and fraudulent EIDL applications to the SBA in their names. The client-applicants agreed to pay the co-schemers 50% of the fraudulently obtained EIDL proceeds derived from each false application. For each applicant that MARKO recruited, Simeunovic agreed to pay MARKO approximately $35,000 if that applicant was ultimately approved for and received EIDL proceeds. From approximately June to August 2020, NIKOLIC recruited approximately 25 client-applicants and was paid approximately $500,000 by Simeunovic for the 12 to 13 client-applicants whose fraudulent EIDLs were approved by the SBA.

Additionally, at the direction of Simeunovic, MARKO also assisted Maja Nikolic in preparing and submitting fraudulent EIDL applications sought by other client-applicants, typically at Simeunovic's SIM Express office in Oak Brook. During the summer of 2020, MARKO and Maja Nikolic paid to reinstate dissolved, Florida-based companies using other individuals' personal information (such as birthdates and social security numbers); sometimes obtained Employer Identification Numbers (EINs) from the IRS for those companies; and filed forms with the Florida Secretary of State that falsely identified the recruited applicants as officers and agents of those companies. MARKO and Maja Nikolic knew that these companies were not in operation at the time they paid to reincorporate them, that the former owners of the companies had not authorized them to reincorporate or assume responsibility for those companies, and that they (MARKO and Maja Nikolic) had no intention to initiate or resume any business operations under those companies' names.

After reincorporating these shell companies, MARKO and Maja Nikolic, at the direction of Simeunovic, used the personal identifying information of individuals who had agreed to pay Simeunovic and Maja Nikolic to prepare and submit fraudulent EIDL applications on their behalf through use of those shell companies. MARKO and Maja Nikolic prepared and submitted to the SBA EIDL applications that falsely and fraudulently represented that (1) the recruited individuals were the owners of the previously dissolved entities; (2) those individuals had assumed ownership of those companies more than one year before the dates on which MARKO and Maja Nikolic

7

had paid to reincorporate those companies; (3) the shell companies employed specified numbers of employees as of January 31, 2020; and (4) those companies had earned and incurred gross revenues and costs in the 12 months prior to January 31, 2020.

MARKO and Maja Nikolic knew at the time they submitted these applications that neither they nor the recruited client-applicants owned or had any relationship to these companies prior to the date they paid to reincorporate them; that the former owners of the companies had not authorized them to assume ownership or responsibility for those companies at any time; that these companies were not in operation; that the applying entities did not have any employees as of January 31, 2020; and that, during the 12 months prior to January 31, 2020, the shell companies neither earned nor incurred the revenues and costs of goods stated in the applications. In some instances, to substantiate their false representations regarding the shell companies' revenues, expenses, and continued existence, MARKO and Maja Nikolic submitted, and caused to be submitted, to the SBA copies of falsified federal corporate income tax documents, knowing that the documents had been falsified.

In several of these EIDL applications, MARKO and Maja Nikolic falsely and fraudulently represented that the applicants were U.S. citizens. In those instances, MARKO and Maja Nikolic knew when they submitted the applications that the applicants were not U.S. citizens and falsely misrepresented their citizenship to evade additional scrutiny, from the SBA, of their false and fraudulent applications.

8

In order to complete and submit the fraudulent applications, MARKO met with the applicants, gathered and recorded their personal information (such as name, date of birth, social security number, contact and bank account information), tracked the status of their fraudulent applications, and communicated with the applicants when additional information was needed and when EIDLs were approved. In some instances, at his direction, Sumakovic assisted MARKO in creating business email accounts and passwords for the shell companies, as well as executing other administrative tasks, so that MARKO could submit fraudulent EIDL applications in a timely manner.

Within days of their submission of each fraudulent EIDL application, MARKO, Sumakovic, Maja Nikolic, and other co-schemers opened and caused others – such as their clients – to open a business bank account in the name of the shell company identified in that application. MARKO and his co-schemers directed the SBA to deposit the proceeds of fraudulently obtained EIDL loans into those bank accounts. Once the EIDL proceeds were received from the SBA, MARKO caused the co-schemers' 50% share of the proceeds to be transferred to an account controlled by Simeunovic.

As part of the scheme, on or about June 23, 2020, MARKO reincorporated a previously dissolved Florida-based company called "Food by Orange," and caused information to be submitted to the Florida Secretary of State that falsely identified MARKO as an agent of the company. On or about June 23, 2020, MARKO submitted

9

to the SBA a false and fraudulent EIDL application on behalf of Food by Orange. In this application, MARKO falsely and fraudulently represented that he was the owner of Food by Orange; that Food by Orange employed 36 individuals as of January 31, 2020; that the company had earned approximately $1,570,000 in gross revenues in the 12 months prior to January 31, 2020; and that the company had incurred approximately $660,000 in cost of goods sold in that same period. MARKO knew at the time he submitted this application that he did not own or have any relationship to Food by Orange prior to the date the schemers paid to reincorporate it; that the former owners of the company had not authorized MARKO to assume ownership or responsibility for that company; that Food by Orange was not in operation and did not have any employees as of January 31, 2020; and that, during the 12 months prior to January 31, 2020, Food by Orange neither earned nor incurred the revenues and costs of goods stated in the application.

SBA subsequently approved the Food by Orange EIDL application. On or about June 29, 2020, MARKO caused the SBA to disburse approximately $149,900 through an interstate wire transfer from the Federal Reserve Bank to a Food by Orange account maintained at Chase Bank, ending in 9036 and controlled by MARKO, which funds represented the proceeds of the EIDL to Food by Orange. MARKO knew at the time that neither he nor Food by Orange was entitled to the EIDL funds, and that the information that he provided about the company's expenses, employees, and continued existence was material to the SBA's approval and funding of this loan.

10

Through his own fraudulent EIDL applications, recruitment of applicants for the scheme, and assistance in the preparation and submission of more than 100 fraudulent EIDL applications for others, MARKO fraudulently sought to obtain approximately $17,700,000 in EIDL loans to which he and his co-schemers were not entitled. Not all of the loans that MARKO sought to obtain fraudulently were approved by the SBA, and as a result, the actual loss resulting from MARKO's conduct is less than $17,700,000.

      b.    With respect to Count 32 of the superseding indictment:

On or about July 14, 2020, in the Northern District of Illinois, Eastern Division, and elsewhere, MARKO NIKOLIC knowingly transmitted and transferred, and attempted to knowingly transmit and transfer, a monetary instrument and funds from a place in the United States to and through a place outside the United States, namely, a wire transfer of approximately $600,000 from a Citibank account ending in 0043 to a bank outside the United States, which transmission and transfer involved the proceeds of a specified unlawful activity, namely, wire fraud, knowing that the transaction was designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of the specified unlawful activity, and that while conducting such financial transactions, the defendant knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(2)(B)(i).

Specifically, MARKO conducted numerous financial transactions involving proceeds of the above-described EIDL fraud scheme. In some instances, MARKO caused the SBA to disburse fraudulently obtained EIDL proceeds into bank accounts that he controlled and opened in the name of a shell company, quickly withdrew the fraudulently obtained proceeds through wire transfers or cashier's checks, then deposited the funds into other bank accounts that he controlled. In some instances, MARKO transferred the fraudulently obtained EIDL proceeds to bank accounts controlled by Nikolic, then directed Nikolic to transfer portions of those proceeds to other financial accounts that MARKO controlled. In other instances, MARKO arranged for the SBA to deposit fraudulently obtained EIDL proceeds into bank accounts controlled by other co-schemers and third parties, then directed those individuals to transfer approximately 50% of those proceeds into bank accounts that Simeunovic controlled. Simeunovic then transferred portions of those proceeds to various bank accounts controlled by his co-schemers, including MARKO, Maja Nikolic, and others.

After accumulating EIDL fraud proceeds in U.S.-based bank accounts that he controlled, MARKO transmitted portions of those proceeds in bulk increments to international accounts outside the United States. For example, by on or about July 14, 2020, MARKO had accumulated more than $600,000 in fraudulently obtained EIDL proceeds in Citibank account ending in 0043. On or about July 14, 2020, MARKO caused a wire transfer of approximately $600,000 from Citibank account

12

0043 to a bank in Serbia, namely, Raiffeisen Banka, A.D., to an account ending in 7956, for the benefit of Individual A. At the time he caused the transaction, MARKO knew that the $600,000 consisted entirely of proceeds derived from the wire fraud scheme.

In total, between approximately May 29, 2020, and October 20, 2020, MARKO transmitted and transferred approximately $3,446,030 in wire fraud proceeds from the United States to Serbia through wire transfers. MARKO knew from his personal experience (including his personal involvement in the wire fraud scheme and his conversations with Simeunovic, Maja Nikolic, and other co-schemers), the large amounts of money involved, and the rapid movement of that money between accounts following its deposit by the SBA, that the proceeds that he transmitted and transferred, and attempted to transmit and transfer, were derived from the EIDL fraud scheme. MARKO transmitted and transferred the fraud proceeds in this manner, and out of the United States, because he wanted to hide his ownership and his control of the proceeds, as well as the nature, location, and source of the proceeds, from law enforcement.

7. The foregoing facts are set forth solely to assist the Court in determining whether a factual basis exists for defendant's plea of guilty, and are not intended to be a complete or comprehensive statement of all the facts within defendant's personal knowledge regarding the charged crimes and related conduct.

## Maximum Statutory Penalties

8.     Defendant understands that the charges to which he is pleading guilty carry the following statutory penalties:

a.     Count 8 carries a maximum sentence of 20 years' imprisonment. Count 8 also carries a maximum fine of $250,000, or twice the gross gain or gross loss resulting from that offense, whichever is greater. Defendant further understands that with respect to Count 8 the judge also may impose a term of supervised release of not more than three years.

b.     Count 32 carries a maximum sentence of 20 years' imprisonment. Count 32 also carries a maximum fine of $500,000, or twice the value of the property involved in the financial transactions from that offense, whichever is greater. Defendant further understands that with respect to Count 32, the judge also may impose a term of supervised release of not more than three years.

c.     Defendant further understands that the Court must order restitution to the victims of the offense in an amount determined by the Court. The Court also may order restitution to any persons as agreed by the parties.

d.     Pursuant to Title 18, United States Code, Section 3013, defendant will be assessed $100 on each count to which he has pled guilty, in addition to any other penalty or restitution imposed.

.e.     Therefore, under the counts to which defendant is pleading guilty, the total maximum sentence is 40 years' imprisonment. In addition, defendant is

14

subject to a total maximum fine of $750,000, or twice the gross gain or gross loss resulting from the wire fraud offense of conviction and twice the value of the funds involved in the money laundering offense of conviction, whichever is greater, a period of supervised release, and special assessments totaling $200, in addition to any restitution ordered by the Court.

### Sentencing Guidelines Calculations

9.     Defendant understands that in determining a sentence, the Court is obligated to calculate the applicable Sentencing Guidelines range, and to consider that range, possible departures under the Sentencing Guidelines, and other sentencing factors under 18 U.S.C. § 3553(a), which include: (i) the nature and circumstances of the offense and the history and characteristics of the defendant; (ii) the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct, protect the public from further crimes of the defendant, and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (iii) the kinds of sentences available; (iv) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (v) the need to provide restitution to any victim of the offense.

10.     For purposes of calculating the Sentencing Guidelines, the parties agree and disagree on the following points:

15

a.      **Applicable Guidelines**. The Sentencing Guidelines to be considered in this case are those in effect at the time of sentencing. The following statements regarding the calculation of the Sentencing Guidelines are based on the Guidelines Manual currently in effect, namely the November 2021 Guidelines Manual.

b.      **Offense Level Calculations.**

i.      **Count 8**: It is the position of the government that the adjusted offense level for Count 8 is 32, based upon the following:

(a)      The parties agree that the base offense level for Count 8 is 7, pursuant to Guideline § 2B1.1(a)(1).

(b)      The parties agree that the offense level is increased by 20 levels, pursuant to Guideline § 2B1.1(b)(1)(K), because the amount of loss for which defendant is accountable is at least $17,700,000, which is more than $9,500,000 and less than $25,000,000.

(c)      The parties agree the offense level is increased by 2 levels, pursuant to Guideline § 2B1.1(b)(10)(C), because the offense involved sophisticated means and the defendant intentionally engaged in and caused the conduct constituting sophisticated means.

(d)      It is the position of the government that the offense level is increased by 3 levels pursuant to Guideline § 3B1.1(b) because the defendant was a manager and supervisor and the criminal activity involved 5 or more

16

participants and was otherwise extensive. Defense reserves the right to contest the applicability of this upward adjustment at sentencing.

    ii.  **Count 32:** The parties agree that the adjusted offense level for Count 32 is 33, based upon the following:

    (a)  Pursuant to Guideline § 2S1.1(a)(1) and § 2S1.1, cmt. n. 2(C), the parties agree the base offense level for Count 32 is the offense level, prior to Chapter Three Adjustments, for the underlying offense from which the laundered funds were derived, namely, the offense of conviction under Count 8, because (i) the defendant committed the underlying offense; and (ii) the offense level for the underlying offense can be determined. Therefore, the base offense level for Count 32 is 29 as calculated under Count 8.

    (b)  The parties agree the offense level for Count 32 is increased by 2 levels, pursuant to Guideline § 2S1.1(b)(2)(B), because the defendant was convicted under 18 U.S.C. § 1956.

    (c)  The parties agree the offense level is increased by 2 levels pursuant to Guideline § 2S1.1(b)(3) because subsection (b)(2)(B) applies and the offense involved sophisticated laundering.

    iii.  **Grouping:** Pursuant to Guideline § 3D1.2(c) and 2S1.1, cmt. n. 6, Count 8 and Count 32 are grouped together into a single Group because Count 8 embodies conduct that is treated as a specific offense characteristic in the

17

guideline applicable to Count 32. Pursuant to Guideline 3D1.3(a), the offense level for the Group is the highest offense level of the counts in the group, which is level 33.

iv. Defendant has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for his criminal conduct. If the government does not receive additional evidence in conflict with this provision, and if defendant continues to accept responsibility for his actions within the meaning of Guideline § 3E1.1(a), including by furnishing the United States Attorney's Office and the Probation Office with all requested financial information relevant to his ability to satisfy any fine or restitution that may be imposed in this case, a two-level reduction in the offense level is appropriate.

v. In accord with Guideline § 3E1.1(b), defendant has timely notified the government of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the Court to allocate its resources efficiently. Therefore, as provided by Guideline § 3E1.1(b), if the Court determines the offense level to be 16 or greater prior to determining that defendant is entitled to a two-level reduction for acceptance of responsibility, the government will move for an additional one-level reduction in the offense level.

c. **Criminal History Category**. With regard to determining defendant's criminal history points and criminal history category, based on the facts now known to the government, defendant's criminal history points equal zero and defendant's criminal history category is I.

18

d.    **Anticipated Advisory Sentencing Guidelines Range.** Therefore, based on the facts now known to the government, the anticipated offense level is 30 which, when combined with the anticipated criminal history category of I, results in an anticipated advisory sentencing guidelines range of 97 to 121 months' imprisonment, in addition to any supervised release, fine, and restitution the Court may impose.

e.    Defendant and his attorney and the government acknowledge that the above guidelines calculations are preliminary in nature, and are non-binding predictions upon which neither party is entitled to rely. Defendant understands that further review of the facts or applicable legal principles may lead the government to conclude that different or additional guidelines provisions apply in this case. Defendant understands that the Probation Office will conduct its own investigation and that the Court ultimately determines the facts and law relevant to sentencing, and that the Court's determinations govern the final guideline calculation. Accordingly, the validity of this Agreement is not contingent upon the probation officer's or the Court's concurrence with the above calculations, and defendant shall not have a right to withdraw his plea on the basis of the Court's rejection of these calculations.

f.    Both parties expressly acknowledge that this Agreement is not governed by Fed. R. Crim. P. 11(c)(1)(B), and that errors in applying or interpreting any of the sentencing guidelines may be corrected by either party prior to sentencing.

19

The parties may correct these errors either by stipulation or by a statement to the Probation Office or the Court, setting forth the disagreement regarding the applicable provisions of the guidelines. The validity of this Agreement will not be affected by such corrections, and defendant shall not have a right to withdraw his plea, nor the government the right to vacate this Agreement, on the basis of such corrections.

## Cooperation

11.    Defendant agrees he will fully and truthfully cooperate in any matter in which he is called upon to cooperate by a representative of the United States Attorney's Office for the Northern District of Illinois. This cooperation shall include providing complete and truthful information in any investigation and pre-trial preparation and complete and truthful testimony in any criminal, civil, or administrative proceeding. Defendant agrees to the postponement of his sentencing until after the conclusion of his cooperation.

## Agreements Relating to Sentencing

12.    At the time of sentencing, the government shall make known to the sentencing judge the extent of defendant's cooperation. If the government determines that defendant has continued to provide full and truthful cooperation as required by this agreement, then the government shall move the court, pursuant to Guideline § 5K1.1, to depart downward from the low end of the applicable guideline range in an amount to be determined by the government at the time of sentencing. Defendant shall be free to recommend any sentence.

13.     If the government does not move the Court, pursuant to Guideline § 5K1.1, to depart from the applicable guideline range, as set forth above, the preceding paragraph of this Agreement will be inoperative, both parties shall be free to recommend any sentence, and the Court shall impose a sentence taking into consideration the factors set forth in 18 U.S.C. § 3553(a) as well as the Sentencing Guidelines without any downward departure for cooperation pursuant to § 5K1.1. Defendant may not withdraw his plea of guilty because the government has failed to make a motion pursuant to Guideline § 5K1.1.

14.     It is understood by the parties that the sentencing judge is neither a party to nor bound by this Agreement and may impose a sentence up to the maximum penalties as set forth above. Defendant further acknowledges that if the Court does not accept the sentencing recommendation of the parties, defendant will have no right to withdraw his guilty plea.

15.     Regarding restitution, defendant acknowledges that pursuant to Title 18, United States Code, Section 3663A, the Court must order defendant, together with any jointly liable co-defendants, to make full restitution in an amount to be determined by the Court at sentencing, which amount shall reflect credit for any funds repaid prior to sentencing.

16.     Restitution shall be due immediately, and paid pursuant to a schedule to be set by the Court at sentencing. Defendant acknowledges that pursuant to Title 18, United States Code, Section 3664(k), he is required to notify the Court and the

United States Attorney's Office of any material change in economic circumstances that might affect his ability to pay restitution.

17.     Defendant agrees to pay the special assessment of $200 at the time of sentencing with a cashier's check or money order payable to the Clerk of the U.S. District Court.

18.     Defendant agrees that the United States may enforce collection of any fine or restitution imposed in this case pursuant to Title 18, United States Code, Sections 3572, 3613, and 3664(m), notwithstanding any payment schedule set by the Court.

19.     After sentence has been imposed on the counts to which defendant pleads guilty as agreed herein, the government will move to dismiss the remaining counts of the superseding indictment, as well as the indictment as to defendant.

**Forfeiture**

20.     Defendant understands that by pleading guilty, he will subject to forfeiture to the United States all right, title, and interest that he has in any property constituting or derived from proceeds obtained, directly or indirectly, as a result of the offense; as well as any property involved in a transaction or attempted transaction in violation of Title 18, United States Code, Section 1956.

21.     Defendant agrees to the entry of a personal money judgment in the amount of $3,446,030, which represents proceeds derived from or traceable to the wire fraud offense charged in Count 8, and property involved in a transaction in

violation of Count 32. Defendant consents to the immediate entry of a preliminary order of forfeiture setting forth the amount of the personal money judgment he will be ordered to pay.

22.     Defendant admits that because the directly forfeitable property is no longer available for forfeiture as described in Title 21, United States Code, Section 853(p)(1), the United States is entitled to seek forfeiture of any other property of defendant, up to the value of the personal money judgment, as substitute assets pursuant to Title 21, United States Code, Section 853(p)(2).

23.     Defendant understands that forfeiture shall not be treated as satisfaction of any fine, cost of imprisonment, or any other penalty the Court may impose upon defendant in addition to the forfeiture judgment.

24.     Defendant agrees to waive all constitutional, statutory, and equitable challenges in any manner, including but not limited to direct appeal or a motion brought under Title 28, United States Code, Section 2255, to any forfeiture carried out in accordance with this agreement on any grounds, including that the forfeiture constitutes an excessive fine or punishment. The waiver in this paragraph does not apply to a claim of involuntariness or ineffective assistance of counsel. Defendant further agrees not to challenge or seek review of the civil or administrative forfeiture of any property identified in this agreement subject to forfeiture, and will not assist any third party with regard to such challenge or review.

## Acknowledgments and Waivers Regarding Plea of Guilty

### Nature of Agreement

25.     This Agreement is entirely voluntary and represents the entire agreement between the United States Attorney and defendant regarding defendant's criminal liability in case 20 CR 750-2

26.     This Agreement concerns criminal liability only. Except as expressly set forth in this Agreement, nothing herein shall constitute a limitation, waiver, or release by the United States or any of its agencies of any administrative or judicial civil claim, demand, or cause of action it may have against defendant or any other person or entity. The obligations of this Agreement are limited to the United States Attorney's Office for the Northern District of Illinois and cannot bind any other federal, state, or local prosecuting, administrative, or regulatory authorities, except as expressly set forth in this Agreement.

### Waiver of Rights

27.     Defendant understands that by pleading guilty he surrenders certain rights, including the following:

a.     **Trial rights.** Defendant has the right to persist in a plea of not guilty to the charges against him, and if he does, he would have the right to a public and speedy trial.

i.     The trial could be either a jury trial or a trial by the judge sitting without a jury. However, in order that the trial be conducted by the judge

24

sitting without a jury, defendant, the government, and the judge all must agree that the trial be conducted by the judge without a jury.

   ii.  If the trial is a jury trial, the jury would be composed of twelve citizens from the district, selected at random. Defendant and his attorney would participate in choosing the jury by requesting that the Court remove prospective jurors for cause where actual bias or other disqualification is shown, or by removing prospective jurors without cause by exercising peremptory challenges.

   iii.  If the trial is a jury trial, the jury would be instructed that defendant is presumed innocent, that the government has the burden of proving defendant guilty beyond a reasonable doubt, and that the jury could not convict him unless, after hearing all the evidence, it was persuaded of his guilt beyond a reasonable doubt and that it was to consider each count of the superseding indictment separately. The jury would have to agree unanimously as to each count before it could return a verdict of guilty or not guilty as to that count.

   iv.  If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, and considering each count separately, whether or not the judge was persuaded that the government had established defendant's guilt beyond a reasonable doubt.

   v.  At a trial, whether by a jury or a judge, the government would be required to present its witnesses and other evidence against defendant.

Defendant would be able to confront those government witnesses and his attorney would be able to cross-examine them.

vi.      At a trial, defendant could present witnesses and other evidence in his own behalf. If the witnesses for defendant would not appear voluntarily, he could require their attendance through the subpoena power of the Court. A defendant is not required to present any evidence.

vii.     At a trial, defendant would have a privilege against self-incrimination so that he could decline to testify, and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify in his own behalf.

b.     **Waiver of appellate and collateral rights**. Defendant further understands he is waiving all appellate issues that might have been available if he had exercised his right to trial. Defendant is aware that Title 28, United States Code, Section 1291, and Title 18, United States Code, Section 3742, afford a defendant the right to appeal his conviction and the sentence imposed. Acknowledging this, if the government makes a motion at sentencing for a downward departure pursuant to Guideline § 5K1.1, defendant knowingly waives the right to appeal his conviction, any pre-trial rulings by the Court, and any part of the sentence (or the manner in which that sentence was determined), including any term of imprisonment and fine within the maximums provided by law, and including any order of restitution or forfeiture, in exchange for the concessions made by the United States in this

26

Agreement. In addition, if the government makes a motion at sentencing for a downward departure pursuant to Guideline § 5K1.1, defendant also waives his right to challenge his conviction and sentence, and the manner in which the sentence was determined, in any collateral attack or future challenge, including but not limited to a motion brought under Title 28, United States Code, Section 2255. The waiver in this paragraph does not apply to a claim of involuntariness or ineffective assistance of counsel, nor does it prohibit defendant from seeking a reduction of sentence based directly on a change in the law that is applicable to defendant and that, prior to the filing of defendant's request for relief, has been expressly made retroactive by an Act of Congress, the Supreme Court, or the United States Sentencing Commission.

28.     Defendant understands that by pleading guilty he is waiving all the rights set forth in the prior paragraphs. Defendant's attorney has explained those rights to him, and the consequences of his waiver of those rights.

### Presentence Investigation Report/Post-Sentence Supervision

29.     Defendant understands that the United States Attorney's Office in its submission to the Probation Office as part of the Pre-Sentence Report and at sentencing shall fully apprise the District Court and the Probation Office of the nature, scope, and extent of defendant's conduct regarding the charges against him, and related matters. The government will make known all matters in aggravation and mitigation relevant to sentencing, including the nature and extent of defendant's cooperation.

30. Defendant agrees to truthfully and completely execute a Financial Statement (with supporting documentation) prior to sentencing, to be provided to and shared among the Court, the Probation Office, and the United States Attorney's Office regarding all details of his financial circumstances, including his recent income tax returns as specified by the probation officer. Defendant understands that providing false or incomplete information, or refusing to provide this information, may be used as a basis for denial of a reduction for acceptance of responsibility pursuant to Guideline § 3E1.1 and enhancement of his sentence for obstruction of justice under Guideline § 3C1.1, and may be prosecuted as a violation of Title 18, United States Code, Section 1001, or as a contempt of the Court.

31. For the purpose of monitoring defendant's compliance with his obligations to pay a fine and restitution during any term of supervised release or probation to which defendant is sentenced, defendant further consents to the disclosure by the IRS to the Probation Office and the United States Attorney's Office of defendant's individual income tax returns (together with extensions, correspondence, and other tax information) filed subsequent to defendant's sentencing, to and including the final year of any period of supervised release or probation to which defendant is sentenced. Defendant also agrees that a certified copy of this Agreement shall be sufficient evidence of defendant's request to the IRS to disclose the returns and return information, as provided for in Title 26, United States Code, Section 6103(b).

## Other Terms

32.     Defendant agrees to cooperate with the United States Attorney's Office in collecting any unpaid fine and restitution for which defendant is liable, including providing financial statements and supporting records as requested by the United States Attorney's Office.

33.     Defendant recognizes that pleading guilty may have consequences with respect to his immigration status if he is not a citizen of the United States. Under federal law, a broad range of crimes are removable offenses, including one or more offenses to which defendant is pleading guilty. Indeed, because defendant is pleading guilty to an offense that is an "aggravated felony" as that term is defined in Title 8, United States Code, Section 1101(a)(43), removal is presumptively mandatory. Removal and other immigration consequences are the subject of a separate proceeding, however, and defendant understands that no one, including his attorney or the Court, can predict to a certainty the effect of his conviction on his immigration status. Defendant nevertheless affirms that he wants to plead guilty regardless of any immigration consequences that his guilty plea may entail, even if the consequence is his automatic removal from the United States.

## Conclusion

34.     Defendant understands that this Agreement will be filed with the Court, will become a matter of public record, and may be disclosed to any person.

35.     Defendant understands that his compliance with each part of this Agreement extends throughout the period of his sentence, and failure to abide by any term of the Agreement is a violation of the Agreement. Defendant further understands that in the event he violates this Agreement, the government, at its option, may move to vacate the Agreement, rendering it null and void, and thereafter prosecute defendant not subject to any of the limits set forth in this Agreement, or may move to resentence defendant or require defendant's specific performance of this Agreement. Defendant understands and agrees that in the event that the Court permits defendant to withdraw from this Agreement, or defendant breaches any of its terms and the government elects to void the Agreement and prosecute defendant, any prosecutions that are not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against defendant in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement of such prosecutions.

36.     Should the judge refuse to accept defendant's plea of guilty, this Agreement shall become null and void and neither party will be bound to it.

37.     Defendant and his attorney acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this Agreement, to cause defendant to plead guilty.

30

38.    Defendant acknowledges that he has read this Agreement and carefully reviewed each provision with his attorney. Defendant further acknowledges that he understands and voluntarily accepts each and every term and condition of this Agreement.


AGREED THIS DATE: _____22 May 23_____


MICHELLE PETERSEN    Digitally signed by MICHELLE PETERSEN
                     Date: 2023.05.20 21:51:54 -05'00'    for MP

MICHELLE PETERSEN on behalf of
MORRIS PASQUAL
Acting United States Attorney

MARKO NIKOLIC
Defendant


MALGORZATA KOZAKA
BRIAN HAYES
Assistant U.S. Attorneys

MICHAEL P. GILLESPIE
MICHAEL D. KREJCI
Attorneys for Defendant


31