UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 20 CR 750-5 |
| v. | |
| BRANKO ALEKSIC | Judge Nancy L. Maldonado |

**GOVERNMENT'S POSITION PAPER AS TO SENTENCING FACTORS**

For the reasons set forth below, the government submits that the imposition of a Guidelines sentence of 51 months' imprisonment for each of Counts Four and 21, sentences to run concurrently, and subject to the conditions set forth in the Presentence Investigation Report ("PSR") is sufficient but not greater than necessary to satisfy the principles set forth in the Sentencing Guidelines and 18 U.S.C. § 3553(a).

## I. BACKGROUND

From approximately March 2020 through at least September 2020, defendant BRANKO ALEKSIC ("ALEKSIC") and other co-schemers knowingly devised, intended to devise, and participated in a scheme to defraud and obtain money and property from U.S. Small Business Administration ("SBA") Economic Injury Disaster Loan ("EIDL") program by materially false and fraudulent pretenses, representations, and promises. They submitted hundreds of fraudulent loan applications to the SBA's EIDL program in hopes of stealing government funding under the guise of businesses seeking pandemic relief under the CARES Act. Once the SBA approved these fraudulent loan requests and sent over millions of dollars in

1

proceeds, these co-defendants then transferred the funds via wire transfers to overseas bank accounts, and used them to purchase luxurious goods. Had all the fraudulent submissions been approved, the loss would have totaled approximately $47 million dollars. Fortunately, the actual loss was much smaller, but still totaled roughly $16 million dollars.

One of the co-schemers, Marko Nikolic ("Marko"), recruited ALEKSIC to participate in the fraud scheme. As part of that scheme, both defendant and Marko, on defendant's behalf, used defendant's name and PII to reinstate multiple dissolved companies, and then submitted online applications for EIDLs to the SBA, claiming these companies had suffered economic injury due to the COVID-19 pandemic. Defendant and Marko, on defendant's behalf, provided fraudulent details about the companies' operations, including the number of employees, gross revenues and costs of goods sold for the 12-month period preceding January 31, 2020. In fact, as defendant knew, the businesses did not exist, had no employees, and suffered no economic injury.

Defendant successfully persuaded the SBA to wire him federal funds to keep his fake businesses afloat. He then used those proceeds to enrich his personal life. For example, one day after law enforcement detained co-defendant Marko, defendant purchased a one-way, international ticket out of the United States mere hours before the actual departure time. As he attempted to board his flight, defendant carried on his person approximately $21,000 in cash along with numerous, high-end luxury items which he appeared to be smuggling out of the country. Law enforcement

confronted defendant, and found him in possession of various IDs and drivers' licenses from different states belonging to both defendant and other individuals, over 25 credit cards, a voided check for a Chase account ending in *4737, vehicle titles, new vehicle license plates, documents reflecting his August 2020 overseas shipment of luxury German vehicles including a BMW 7 Series and Mercedes Benz GL-Class, laptops, iPads, iPhones, other new electronic devices, Rolex watches, diamonds and other jewelry, and check books. Of note, within the 25 credit cards, agents located business credit cards listing the same shell companies directly associated with his fraudulently submitted EIDL applications, including cards for Gratz Logistics, Pool B Clean, AB Freight LLC, and BIA Trucking.

In addition to participating in the scheme directly, defendant brought others onboard to partake in the scheme as well. For example, defendant was paid $47,500 on two occasions, on June 25, 2020, and June 26, 2020, by wire transfer from a SIM Express account for referring client-applicants to co-defendants Marko and Nebojsa Simeunovic ("Nebojsa").

Unbeknownst to the defendant, one of the applicants in the fraud scheme was a cooperating source ("CS") with the government. Law enforcement uncovered the extent and details of the fraud scheme, including one main point of contact: defendant Maja Nikolic ("Maja"). Agents knew that these defendants had collectively submitted hundreds of fraudulent loan applications to the SBA EIDL program in order to steal government funding for businesses seeking pandemic relief, withdrew the fraudulent funds from their bank accounts, laundering the funds through wire transfers and

other financial instruments to other domestic bank accounts in their control or to overseas bank accounts held by family members.

As the investigation expanded, agents performed surveillance outside of co-defendant Maja's Brookfield, Illinois apartment on October 23, 2020. On that rainy day, agents observed co-defendants Marko and his girlfriend Milica Sumakovic ("Milica") packing luggage and computer equipment into multiple luxury vehicles. Agents arrested both individuals and sought federal search warrants for several locations, which resulted in the discovery of multiple computers, phones, and six notebooks. Specifically, these notebooks contained a handwritten chronology of the Covid-19 fraud scheme, including detailed entries and notes of shell companies, applicants' names, aliases, dates of birth, other PII, banks account numbers, emails, passwords and passcodes, statuses of applications including rejections, loan distributions, percentages and ratios, and recruitment payments. One notebook belonging to co-defendant Marko repeatedly identified defendant as part of the fraud.

Meanwhile, that next day of October 24, 2020, defendant attempted to flee the United States on a one-way ticket to Europe. Agents from Customs and Border Protection ("CBP") approached defendant as he was boarding, detained him, and conducted an interview. During the conversations, defendant admitted he had engaged in numerous fraudulent activities. He discussed participating in a fraudulent marriage to circumvent immigration laws. (*see* PSR ¶¶ 24) Defendant also advised that he participated in the Covid-19 fraud scheme. (*see* PSR ¶¶ 8–24)

In his written plea agreement and during his plea allocution, defendant admitted that over the course of the entire scheme, defendant fraudulently submitted multiple EIDL applications for at least six businesses, directly received $575,000 in fraudulently obtained funds, and caused a loss of $930,000 to the United States. Dkt. No. 173. The $575,000 consisted of $480,000 received from the SBA, and $95,000 transferred to him from a SIM Express for referring client-applicants other co-schemers. After the EIDL funds were deposited in his accounts, in addition to numerous withdrawals for his own financial benefit, defendant executed several wire transfers from the United States to overseas accounts to relatives as donations and/or gifts.

## II.  PRESENTENCE INVESTIGATION REPORT & GUIDELINES CALCULATIONS

The government has no objections to the Guidelines and criminal history calculations in the Presentence Investigation Report, which match those set out in the Government's Version of the Offense. PSR ¶¶28-43, 49, 92-97. The PSR correctly calculates an offense level of 22 and a criminal history category of I, with an advisory Guidelines imprisonment range of 41 months to 51 months.

## III.  ANALYSIS OF SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

Although a sentence within the Guidelines range is presumptively reasonable, *United States v. Cano-Rodriguez*, 552 F.3d 637, 639 (7th Cir. 2009), the Court must consider the factors set forth in Title 18, United States Code, Section 3553(a), in determining an appropriate sentence. Considering these factors, in this case a Guidelines sentence of 51 months' imprisonment on Count Four, concurrent with 51

months' imprisonment on Count 21, is sufficient, but not greater than necessary, to reflect the seriousness of defendant's offenses, promote respect for the law, provide just punishment for defendant's crimes, and afford adequate deterrence to similar criminal conduct.

### A. NATURE AND CIRCUMSTANCES OF THE OFFENSE

Financial fraud is a massive illegal industry that imposes huge costs on our economy. In 2020, this fraudulent conduct increased exponentially due to both the beginning of the COVID-19 pandemic and federal legislation designed to provide emergency economic relief during such an unprecedented time. As the pandemic spread, millions of people in the United States lost their jobs seemingly overnight. Approximately 23.1 million Americans were unemployed as of April 2020.[1] The U.S. real gross domestic product (GDP) "fell by 8.9 percent in the second quarter of 2020 … the largest single-quarter contraction in more than 70 years."[2] In March of 2020, the United States declared the COVID-19 pandemic a national disaster.

The declaration triggered economic assistance from Congress in the form of the Coronavirus Aid, Relief, and Economic Security Act, more commonly known as the "CARES ACT." Pub. L. No. 116-136, 134 Stat. 281 (2020) in March of 2020. This federal legislation was specifically designed to provide emergency financial assistance to millions of Americans suffering economic injury through various

---

[1] "TED: Economics Daily," U.S. Bureau of Labor Statistics, available at https://https://www.bls.gov/opub/ted/2020/unemployment-rate-rises-to-record-high-14-point-7-percent-in-april-2020.htm (last visited October 17, 2023)

[2] "The U.S. Economy and the Global Pandemic, Chapter 3," the White House (April 26, 2022, 4:00 p.m.) available at whitehouse.gov/wp-content/uploads/2022/04/Chapter-3-new.pdf (last visited October 17, 2023)

stimulus packages and expanded financial resources to include not only individuals and families, but also to small businesses, non-profit organizations, sole proprietors, and independent contractors. In total, Congress approved nearly $4 trillion dollars in financial aid.

The CARES Act generously made billions of government-guaranteed loans available to qualified small businesses. Specifically, the U.S. Small Business Administration ("SBA") made government-guaranteed loans available to qualified small businesses through the Payroll Protection Program ("PPP") and Economic Injury Disaster Loan ("EIDL") programs to provide working capital and operating expenses during the pandemic. Almost immediately, and in collaboration with various state and federal government agencies, the U.S. Treasury began disbursing government stimulus checks, PPP loans, and EIDL loans, in conjunction with other standard benefits such as social security, disability, unemployment, and tax credits. The public received financial assistance quickly and efficiently, whether through direct deposit, postal mail, or a combination of both.

As the nation plunged deeper into the pandemic, Congress repeatedly approved and announced billions of dollars in stimulus packages every few months, and released that money directly to the public within mere days. Auditing became an afterthought. With the anticipated "wall of money" dispersing from Washington and a country halted by a global pandemic, the perfect storm of opportunity and circumstances arose for thousands to commit COVID-19-related crimes. This defendant was no exception. At a time of incredible uncertainty, with millions of

Americans struggling to survive and pay their bills, defendant saw opportunity.

Tone-deaf to the global health crisis, plight of millions, and the laws of this country, defendant repeatedly and for months chose to exploit the United States by fraudulently submitting EIDL applications, successfully obtaining numerous fraudulent loans for his own materialistic gain. Defendant's actions were not a mistake, a misunderstanding, or undertaken in either good faith or acts of desperation. He had the benefit of being employed and having a steady source of income as well as enviable skills and options to seek out legitimate income. PSR at ¶¶79-85. Instead, defendant chose the path of least resistance to get "easy money" through government benefits which should have been used as working capital for those with legitimate businesses and needs.

Once he received the fraud proceeds into domestic bank accounts, defendant did not spend the money on necessary living expenses or medical bills. Instead, defendant either laundered it overseas or bought luxurious toys, including electronic gadgets and expensive jewelry, such as a Rolex watch. Simply put, defendant did not need to commit this crime. So while defendant may have projected an outward appearance of material wealth and success when he boarded his international flight at O'Hare Airport in October of 2020, it was a mirage resulting directly from fraudulent proceeds he had stolen from the American people. His offense was a crime of choice, not of necessity, and it came at a great cost to taxpayers and this country. This was the same country that had welcomed him and granted him immigration benefits, albeit benefits that defendant obtained fraudulently.

The circumstances surrounding this defendant's criminal conduct are particularly troubling because he used a national tragedy to enrich himself through fraud, using supplies meant to alleviate the legitimate economic suffering. This Court should give great weight to this factor in imposing a carceral sentence. *See Gall*, 522 U.S. at 59 (holding it was "quite reasonabl[e]" for the sentencing for the sentencing court to have "attached great weight" to a 3553(a) factor.); *see also Kimbrough v. United States*, 552 U.S. 85, 111 (2007) (holding that appellate court should not find the sentencing court's reliance on a single factor unreasonable, so long as the court imposes a sentence sufficient, but not greater than necessary to accomplish the sentencing goals advanced in § 3553(a)(2)") (internal quotation marks omitted); *see also United States v. Pauley*, 511 F.3d 468, 476 (4th Cir. 2007) (permitting a district court to "reasonably accord significant weight to a single sentencing factor in fashioning its sentence.")

Here, the victim of the fraud is a federal agency that is unable to recover the loss amount from an insurance policy or a bank, and instead, must collect it from taxes imposed on those who already suffer economically from the pandemic. The personal toll of Covid-19 fraud is high because it imposes a financial hardship on United States citizens, leading to years of investigations, prosecutions, and attempts at recouping stolen funds. Defendant knew he was taking money that would have otherwise gone to real people. After all, defendant and his co-schemers re-instated real businesses, signed real names on LLC documents, passed the shell business names and associated bank account details to the United States, all in an effort to

fraudulently obtain federal funds, launder them, and then flee the country.

A total Guidelines sentence of 51 months reflects the nature and circumstances of the offense, including the substantial effects on individual victim taxpayers and the economy at large. In contrast, any below-Guidelines sentence in this case would undercut that message, and instead, show that financial fraud on our government is a victimless crime, which this case makes clear is far from the truth.

**B. HISTORY AND CHARACTERISTICS OF THE DEFENDANT**

The government acknowledges the mitigating circumstances surrounding the defendant, including his childhood spent in a war-torn country, his extensive work history, and his immigration into the United States for, presumably, a better life. PSR at ¶2. It is also clear that defendant is devoted to his family, for whom his imprisonment has been challenging, especially in light of the birth of his first child. PSR at ¶¶61. Def. Sent. Mem. at 5. The Court must balance these mitigating circumstances against defendant's own choices and actions within the fraud scheme.

Here, the mitigation cuts both ways, and defendant's history and characteristics support a lengthy period of incarceration. For the reasons further explained below, even though defendant has no criminal history and was not the mastermind behind the fraud scheme, his repeated participation in the scheme coupled with his recruitment and the amount of money illegally syphoned from the United States and wired overseas or spent haphazardly on unnecessary luxury goods suggests that only a custodial sentence would serve as just punishment.

In aggravation, defendant did not commit this crime out of financial desperation or slowly drift into a criminal scheme from otherwise lawful employment. In fact, his history and characteristics show that he used his talents and potential to commit himself to participate in fraud. Defendant began working at age 14, and held numerous jobs before he made the intentional choice to turn to criminal conduct. In years past, he worked hard to support himself through an honest living, whether in a conflict zone or a peaceful democracy, and successfully transitioned and established himself here in the United States after emigrating from Montenegro.

In addition to his strong work ethic, defendant clearly had remarkable ambition and marketable skills he could have been used to excel legally in this country. Defendant is fluent in both English and Montenegrin and understands Italian. PSR at ¶¶79. He traveled extensively through Europe and to every state in the US except Alaska. PSR at ¶¶70. In his formative years, he excelled academically. Defendant graduated from high school, earned a Bachelor's degree in International Relations and Diplomacy from University of Donja Gorica (U.D.G.) in 2011, and enrolled in a Master's degree program in Business Relationships. PSR at ¶¶74. In 2013, defendant received his postgraduate diplomas in both Humanistic Studies as well as Foreign Policy and Diplomacy. PSR at ¶¶74. While attending university, defendant served as a "volunteer" for student rights, acting as a student representative at the university. He took numerous courses in international relationships, and was encouraged to be part of both NATO and a non-governmental organization. PSR at ¶¶74. In addition to his scholastic achievements, he was also

one of the top tennis players in the country of Montenegro and completed several internships, attended seminars, and earned numerous certificates. PSR at ¶¶57, 74. Def. Sent. Mem. at 2-3.

Once in this country, however, defendant turned his back on his own potential. Instead of pursing lawful employment, defendant sought to make more money more easily than the difficult jobs in trucking and other industries he had previously undertaken. PSR at ¶¶79-85. And when his crimes caught up with some of his co-conspirators on October 23, 2020, defendant thought he could simply flee the country, taking the fraudulently obtained funds and luxury items with him, including laptops, tablets, phones, other electronic devices, $21,000 in cash, Rolex watches, and diamonds. PSR at ¶¶23. He had also had the foresight to ship cars to Europe months earlier as well. Additionally, this was not the first time defendant had exploited the United States for government benefits; years earlier, he had entered into a fraudulent marriage for purposes of obtaining permanent immigration benefits as well. PSR at ¶¶24. Fortunately for taxpayers, that plan failed.

Defendant's fraudulent conduct was not a one-time lapse in judgement. He made a series of choices over several months. He chose to commit overt acts to execute the fraud scheme himself. He chose to assist the co-schemers with applying for pandemic relief loans. He chose to recruit others to participate in the fraud. He chose to launder money overseas. He chose to try and flee with fraud proceeds in tow. In summary, defendant submitted at least seven fraudulent EIDL applications for at least six companies, and received funding for four applications. Admittedly,

defendant received a smaller percentage of the fraud proceeds as compared to other co-defendants, but he directly received $575,000 in fraud proceeds for his own personal use. Dkt. No. 173. We do not know how much money remains, but we do know that none of it went back to the defendant's victim, the United States.

### C. The Need for the Sentence to Reflect the Seriousness of the Offense, Provide Just Punishment and Protect the Public

Defendant's conduct demonstrates a blatant disregard for this country's laws and failure to appreciate the purpose of pandemic relief loans and the context surrounding them, including the lived experiences of millions who suffered through economic hardships without choosing to exploit others. Defendant used funds designed to supplement payroll expenses, sick leave, production costs, and fixed debts, such as utilities, rent, and mortgage payments to personally enrich himself with luxury items at the expense of taxpayers, small businesses, and the United States as a whole. The impact of his actions, however, extends far beyond this case.

In addition to the financial loss amount incurred by the SBA, defendant's fraudulent actions caused an unquantifiable loss of confidence in the government. Specifically, his conduct directly undermined public confidence in the institution's ability to provide for its citizens during a national emergency. This country and its citizens incurred the added expense of granting him immigration benefits under false pretenses, due to his marriage fraud, then allocating financial resources to investigate his criminal conduct, implementing measures to deter others from similar criminal activity, and raising taxes to mitigate the actual loss from his fraud.

A Guideline sentence of 51 months' imprisonment accounts for the appropriate factors and aligns with the goals of the sentencing guidelines espoused in 18 U.S.C. § 3553, including acknowledging the seriousness of the offense, providing just punishment, and protecting the public.

### D. THE NEED TO DETER FUTURE CRIMINAL CONDUCT AND PROMOTE RESPECT FOR THE LAW

The Covid-19 pandemic relief loan frauds represent deliberate and calculated crimes of choice. At a time when the country was on lockdown during a pandemic, faces were hidden behind masks, and self-preservation mandated prioritizing one's own health and that of one's family over all other responsibilities, criminals like this defendant saw an opportunity for financial fraud. Individuals who consider using national emergencies as an opportunity to repeatedly exploit governmental efforts intended to aid the public during times of economic uncertainty must be deterred.

Furthermore, defendant is not a passive participant in a victimless crime. During the largest global health crisis in over a century, Covid-19-related fraud ran rampant. As much as $136 billion dollars in EIDL funds and $64 billion dollars in PPP funds were stolen by people like this defendant.[3] Congress recognizes the importance of general deterrence in the context of white-collar crime such as this. Every time federal benefits are obtained through fraud it misappropriates taxpayer

---

[3] "The Great Grift: More than $200 billion in Covid-19 aid may have been stolen, says federal watchdog," by Richard Lardner and Jennifer McDermott, available at https://apnews.com/article/pandemic-covid19-fraud-small-business-inspector-general-7e651b3e405863f0be9f2e34ca47b93e (last visited October 17, 2023); See also, "Government Watchdog Estimates U.S. Lost $200 billion to COVID Fraud," by Erin Doherty, Axios, available at https://www.axios.com/2023/06/27/covid-relief-fraud-inspector-general-sba (last visited October 17, 2023) (quoting the Small Business Administration's Office of Inspector General's report.)

dollars and shakes public confidence in the government itself. Moreover, financial fraud is lucrative and can be difficult to detect. See, e.g., *United States v. Hefferman*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offense that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it.")

With over $200 Billion in stolen pandemic relief funds, it is imperative to underscore the scale of fraud undertaken by criminals during an unprecedented health crisis. As government agencies increase scrutiny and auditing of the disbursement of COVID-19 relief funds in this post-pandemic world, proactive steps must be taken to not only investigate fraud but also maximize efforts to deter future conduct by others. Imposing a strong sentence provides a cost-cutting strategy that enables this country, and this Court, to meet the challenging realities of preventing recidivism and future criminal conduct.

Additionally, this sentence is needed for purposes of specific deterrence. Defendant has a history of defrauding the government of its benefits. As mentioned above, he entered into a fraudulent marriage to illegally obtain favorable immigration status in the United States. While staying in this country illegally, he subsequently stole and internationally laundered government funding designated to relieve economic injury resulting from the Covid-19 pandemic. A Guideline sentence of 51 months' imprisonment sends a message to defendant and his cohorts that they face consequences for violating the laws of other countries, and that their behavior will

not be tolerated. It also affords adequate deterrence to other, similarly situated individuals who consider engaging in sophisticated financial fraud.

### E. THE NEED TO AVOID UNWARRANTED SENTENCING DISPARITIES

A sentence that bears a relationship to the guidelines provides guardrails for the Court and avoids unwarranted sentencing disparities with other offenders who are sentenced in this district and across the United States. When considering an appropriate sentence, the government recommends a Guideline sentence that is not greater than necessary to reflect the goals of sentencing espoused in 18 U.S.C. § 3553. Although not at the bottom of the Guidelines range which defendant faces, this significant sentence of imprisonment sends a direct message of zero tolerance for exploitation of government benefits during a national crisis at the expense of taxpayers. It also aligns with the goals of the sentencing guidelines espoused in 18 U.S.C. § 3553.

For all of the reasons outlined above, defendant should not receive a downward departure.

## IV. SUPERVISED RELEASE

The government agrees with Probation that a term of supervised release may not be necessary in this case, pursuant to Guideline § 5D1.1, because it is not required by statute and the defendant is likely to be deported following his term of imprisonment. PSR at ¶1-2. Consistent with Probation's recommendation, however, the government agrees with recommending a term of supervised release and proposed mandatory, discretionary, and special conditions of supervised release in case there

is a gap between the date defendant finishes his sentence and the date of his deportation. PSR at ¶16-22. The government would also ask that the Court impose Discretionary Condition #2, requiring the defendant to make restitution to the victim of his offense.

Although defendant is undoubtedly remorseful and wishes to change his life for the better, he has demonstrated that he excels most when met with consequences worthy of his attention. The conditions set forth in the PSR will serve as boundaries needed to curtail his criminal behavior. Imposing a term of supervised release would place the defendant under the jurisdiction of the Probation Department, allowing for additional restrictions if his opportunistic impulses return. In addition to reducing the chances of recidivism, these proposed conditions would encourage rehabilitation and facilitate supervision. *See United States v. Flores*, 929 F.3d 443, 451 (7th Cir. 2019) ("We have long assumed that probation officers work *with* defendants, not against them, to help defendants transition back into society after prison.") (emphasis in original); *United States v. Lewis*, 823 F.3d 1075, 1080 (7th Cir. 2016) ("When it is managed well, supervised release can serve the complimentary goals of protecting the public and rehabilitating an offender who is returning to free society."); *United States v. Neal*, 810 F.3d 512, 519 (7th Cir. 2016) ("The point of supervised release is to rehabilitate persons discharged from prison and to assist their law-abiding return to society."); *United States v. Thompson*, 777 F.3d 368, 374 (7th Cir. 2015) (reducing recidivism and encouraging rehabilitation are goals of supervised release); *United States v. Siegel*, 753 F.3d 705, 708 (7th Cir. 2014) ("Reducing recidivism is the main

purpose of supervised release, though some of the conditions of supervised release are intended to help the released prisoner adjust to life on the outside even if there is no worry that without them he would be likely to commit crimes.").

For the reasons discussed above, supervised release is appropriate, as outlined below.

**MANDATORY CONDITIONS:**

1. The defendant shall not commit another federal, state or local crime. <u>Justification</u>: This condition is mandatory under 18 U.S.C. § 3583(d) and would serve to support defendant's rehabilitation and reintegration into the community and ensure that the defendant is engaged in lawful pursuits rather than criminal activity.

2. The defendant shall not unlawfully possess a controlled substance. <u>Justification</u>: This condition is mandatory under 18 U.S.C. § 3583(d) and would serve to support defendant's rehabilitation and reintegration into the community and ensure that the defendant is engaged in lawful pursuits rather than criminal activity.

3. The defendant shall cooperate in the collection of a DNA sample if the collection of such a sample is required by law. <u>Justification</u>: This condition is mandatory under 18 U.S.C. § 3583(d) and would serve to facilitate supervision by the probation officer, thus assisting in encouraging defendant's compliance with the law and deterring the defendant from future crimes.

**DISCRETIONARY CONDITIONS:**

4. The defendant shall provide financial support to dependents if financially able. <u>Justification</u>: Defendant currently has a young dependent (PSR ¶ ___), and this condition would serve to support defendant's rehabilitation and reintegration into the community and ensure that the defendant is engaged in lawful pursuits rather than criminal activity.

5. The defendant shall seek, and work conscientiously at, lawful employment or pursue conscientiously a course of study or vocational training that will equip the defendant for employment. <u>Justification</u>: This condition would serve to support defendant's rehabilitation and reintegration into the community and ensure that the defendant is engaged in lawful pursuits rather than criminal activity.

6. The defendant shall refrain from knowingly meeting or communicating with any person whom the defendant knows to be engaged, or planning to be engaged, in criminal activity. <u>Justification</u>: This condition would serve to support defendant's rehabilitation and reintegration into the community and ensure that the defendant is engaged in lawful pursuits rather than criminal activity. *See United States v. Kappes*, 782 F.3d 828, 849 (7th Cir. 2015) ("A suggested modification would be to forbid the defendant 'to meet, communicate, or otherwise interact with a person whom he knows to be engaged, or planning to be engaged, in criminal activity.'") (quoting *Thompson*, 777 F.3d at 377); *United States v. Poulin*, 809 F.3d 924, 934 (7th Cir. 2016) (same).

7. The defendant shall refrain from excessive use of alcohol (defined as having a blood alcohol concentration greater than 0.08%), or any use of a narcotic drug or other controlled substance, as defined in § 10.2 of the Controlled Substances Act (21 U.S.C. § 802), without a prescription by a licensed medical practitioner. <u>Justification</u>: This condition would serve to support defendant's rehabilitation and reintegration into the community and ensure that the defendant is engaged in lawful pursuits rather than criminal activity. *See United States v. Hudson*, 908 F.3d 1083, 1084 (7th Cir. 2018) ("[A] condition of supervised release prohibiting 'excessive' alcohol use, without more, is impermissibly vague.") (quoting *Kappes*, 782 F.3d at 849).

8. The defendant shall refrain from possessing a firearm, destructive device, or any other dangerous weapon. <u>Justification</u>: This condition would serve to facilitate supervision by the probation officer, thus assisting in encouraging defendant's compliance with the law and deterring the defendant from future crimes, while protecting the public. *See United States v. Speed*, 811 F.3d 854, 861 (7th Cir. 2016) ("[A] condition prohibiting dangerous weapons provides sufficient notice of the prohibited conduct to a person of reasonable intelligence.").

9. The defendant shall not knowingly leave the federal judicial district where he or she is authorized to reside without first getting permission from the court or the probation officer. <u>Justification</u>: This condition would serve to facilitate supervision by the probation officer, thus assisting in encouraging defendant's compliance with the law and deterring the defendant from future crimes. *See United States v. Gawron*, 929 F.3d 473, 478 (7th Cir. 2019) (this condition should contain a scienter requirement); *United States v. Hunt*, 930 F.3d 921, 925 (7th Cir. 2019) (same); *United States v. Hudson*, 908 F.3d 1083, 1085 (7th Cir. 2018) ("The better term to use in this standard condition is 'judicial district,' as it denotes geographical (as opposed to jurisdictional) boundaries."); *United States v. Givens*, 875 F.3d 387, 390 (7th Cir. 2017) ("[T]his particular condition is administrative in nature and can be imposed whenever a district

court adequately explains the need for supervised release in the first instance.").

10. The defendant shall report to a probation officer as directed by the Court or a probation officer. <u>Justification</u>: This condition would serve to facilitate supervision by the probation officer, thus assisting in encouraging defendant's compliance with the law and deterring the defendant from future crimes.

11. The defendant shall permit a probation officer to visit the defendant at any reasonable time at home, work, school, community service location, and other reasonable location specified by a probation officer and permit confiscation of any contraband observed in plain view of the probation officer. <u>Justification</u>: This condition would serve to facilitate supervision by the probation officer, thus assisting in encouraging defendant's compliance with the law and deterring the defendant from future crimes. *See United States v. Downey*, 908 F.3d 205, 207 (7th Cir. 2018) ("[T]he concern with the probation officer choosing an inconvenient, inappropriate or remote location could be alleviated by including a requirement of reasonableness."); *United States v. Bloch*, 825 F.3d 862, 875 (7th Cir. 2016) ("[T]his condition helps the defendant 'reintegrate into society after his time in prison and to ensure that he is abiding by the conditions of his supervised release.'") (quoting *United States v. Armour*, 804 F.3d 859, 870 (7th Cir. 2015)); *United States v. Carson*, 821 F.3d 849, 851 (7th Cir. 2016) ("Home visits might turn up guns, drugs, or other signs of trouble.").

12. The defendant shall notify a probation officer promptly, within 72 hours, of any change in residence, employer, or workplace and, absent constitutional or other legal privilege, answer inquiries by a probation officer. <u>Justification</u>: This condition would serve to facilitate supervision by the probation officer, thus assisting in encouraging defendant's compliance with the law and deterring the defendant from future crimes.

13. The defendant shall notify a probation officer promptly, within 72 hours, if arrested or questioned by a law enforcement officer. <u>Justification</u>: This condition would serve to facilitate supervision by the probation officer, thus assisting in encouraging defendant's compliance with the law and deterring the defendant from future crimes. *See Kappes*, 782 F.3d at 850 ("[T]his condition assists the probation officer in monitoring the defendant's conduct and compliance with the other conditions of release, most notably, the mandatory condition that the defendant commit no other criminal offenses.").

14. The defendant shall be surrendered to a duly authorized official of the Homeland Security Department for a determination on the issue of deportability by the appropriate in accordance with the laws under the Immigration and Nationality Act and the established implementing regulations. If ordered deported, the defendant shall not reenter the United

States without obtaining, in advance, the express written consent of the Attorney General or the Secretary of the Department of Homeland Security. <u>Justification</u>: Due to the defendant's background and immigration status, this condition would serve to facilitate compliance with the laws under the Immigration and Nationality Act.

**SPECIAL CONDITIONS:**

15. The defendant shall not incur new credit charges or open additional lines of credit without the approval of a probation officer unless the defendant is in compliance with the financial obligations imposed by this judgment. <u>Justification</u>: This condition would serve to ensure that defendant is engaged in responsible financial behavior while on supervised release, consistent with the need to meet the financial obligations ordered as part of his sentence.

16. The defendant shall provide a probation officer with access to any requested financial information necessary to monitor compliance with conditions of supervised release. <u>Justification</u>: This condition would serve to ensure that defendant is engaged in responsible financial behavior while on supervised release, consistent with the need to meet the financial obligations ordered as part of his sentence.

17. The defendant shall notify the Court, within 72 hours, of any material change in the defendant's economic circumstances that might affect the defendant's ability to pay restitution, fines, or special assessments. <u>Justification</u>: This condition would serve to ensure that defendant is engaged in responsible financial behavior while on supervised release, consistent with the need to meet the financial obligations ordered as part of his sentence.

18. The defendant shall pay any financial penalty that is imposed and remains unpaid at the commencement of the term of supervised release. The defendant's monthly payment schedule shall be an amount that is at least 10% of defendant's net monthly income, defined as income net of reasonable expenses for basic necessities such as food, shelter, utilities, insurance, and employment-related expenses. <u>Justification</u>: This condition would serve to ensure that defendant is engaged in responsible financial behavior while on supervised release, consistent with the need to meet the financial obligations ordered as part of his sentence.

19. The defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the probation officer. <u>Justification</u>: The government recommends modifying this condition to require the probation officer's—as opposed to the Court's—permission.

## V.    RESTITUTION

The government agrees with the mandatory restitution amount ($575,000) and lists the victim as the SBA, as set out by Probation in the Presentence Investigation Report. PSR ¶¶91.

## VI.    CONCLUSION

For the reasons set forth above, the government respectfully requests that this Court impose a Guidelines sentence of 51 months' imprisonment on both Counts Four and Count 21, sentences to run concurrently, followed by the conditions discussed in the PSR. This sentence reflects the serious nature of the offense and the history and characteristics of the defendant, but is not greater than necessary to reflect the goals of sentencing espoused in 18 U.S.C. § 3553.

Respectfully submitted,

MORRIS PASQUAL
Acting United States Attorney

By:    */s/ Malgorzata Tracz Kozaka*
MALGORZATA TRACZ KOZAKA
Special Assistant United States Attorney
219 S. Dearborn Street, 5th Floor
Chicago, Illinois 60604
(312) 353-5300