UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 20 CR 750-2 |
| v. | ) | |
| | ) | Judge Nancy Maldonado |
| MARKO NIKOLIC | ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

While individuals and small businesses were struggling during the Covid-19 pandemic, defendant sought to profit from the crisis by stealing millions of dollars from the Economic Disaster Injury Loan ("EIDL") program. Defendant was rewarded handsomely by the originators of the scheme for recruiting participants and managing the progression of their many fraudulent EIDL applications. After he was arrested and charged, however, defendant chose to cooperate with the government. As a result, the government anticipates that it will make a 5K recommendation in the defendant's favor. As indicated in his sentencing memorandum and the PSR, defendant's efforts to liquidate assets to pay restitution are continuing. As a result, the government is withholding a specific recommendation until the sentencing hearing to learn the outcome of those remaining efforts.

**I.     The offenses of conviction**

The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in March 2020 and designed to provide emergency financial assistance to the millions of Americans who were suffering the economic effects caused by the COVID-19 pandemic. One source of relief provided by the CARES Act

was the expansion of the EIDL program, which provided loan assistance (including advances of up to $10,000) for businesses with, among other things, 500 or fewer employees and other eligible entities. The EIDL program was designed to provide economic relief to small businesses that were experiencing a temporary loss of revenue.

Defendant knew that, to gain access to funds through the EIDL Program, small businesses applied through the U.S. Small Business Administration ("SBA") via an online portal and application. Defendant knew that the SBA required applicants to submit truthful information about the applying entity, its owner, and its condition prior to the COVID-19 pandemic. Defendant knew that applicants who received EIDL proceeds were required to use those proceeds to pay an array of working capital and normal operating expenses, such as continuation of health care benefits, rent, utilities, and fixed debt payments. Information about the EIDL applicants' business expenses and employees, and how the EIDL would be used, was material to the SBA's approval, terms, and funding of EIDL loans.

*Wire fraud*

Between in or around March 2020 and September 2020, defendant and his-co-schemers submitted and caused to be submitted over 300 applications for loans and advances under the EIDL Program on behalf of businesses and entities purportedly owned by the defendants and others, which applications contained materially false statements and misrepresentations concerning, among other things, the applicants'

2

citizenship status and the purported entities' number of employees, revenues, expenses, type of business, and ownership.

In furtherance of this scheme, defendant and his co-schemers paid for, and caused others to pay for, the reincorporation of previously dissolved companies ("shell companies"); identified themselves as and others as officers and agents of those shell companies in various state incorporation filings; and submitted, and caused others to submit, EIDL applications in which they falsely and fraudulently represented that the applicants assumed ownership and operation of the shell companies more than one year before the dates on which they paid to reincorporate them. As defendant knew at the time, these shell companies were not in operation when they submitted these EIDL applications, the co-schemers did not own or have any relationship to these companies prior to the date they paid to reincorporate them; the former owners of the companies had not authorized them to reincorporate or assume responsibility for those companies; and the applicants did not qualify for any of the loan proceeds that they sought on behalf of those companies.

On or about March 30, 2020, defendant and his sister, Maja Nikolic, prepared and submitted two EIDL applications for two different businesses that defendant owned and operated, namely, I-Truck Logistics and BG Cargo. In these applications, MARKO falsely and fraudulently represented each company's number of employees, and gross revenues for the 12-month period preceding January 31, 2020. Defendant knew at the time that I-Truck Logistics and BG Cargo did not employ the number of

employees represented in the applications, nor had they earned the amounts of revenue stated in the applications.

As a result of these applications, on or about May 14, 2020, and May 12, 2020, defendant caused the SBA to disburse EIDLs of approximately $149,900 for each of I-Truck Logistics and BG Cargo, respectively, into a bank account that he opened and controlled. Defendant knew at the time that neither he, I-Truck Logistics, nor BG Cargo was entitled to the EIDL funds.

By no later than April 2020, defendant learned that Simeunovic, Maja Nikolic, and others were submitting additional EIDL applications for other businesses, including a business operated by Simeunovic in Oak Brook, Illinois, named "SIM Express." By no later than June 2020, Simeunovic agreed to pay defendant money to recruit other client-applicants to give Simeunovic and Maja Nikolic their personal identifying information and to allow Simeunovic and Maja Nikolic to prepare and submit false and fraudulent EIDL applications to the SBA in their names. The client-applicants agreed to pay the co-schemers 50% of the fraudulently obtained EIDL proceeds derived from each false application. For each applicant that defendant recruited, Simeunovic agreed to pay defendant approximately $35,000 if that applicant was ultimately approved for and received EIDL proceeds. From approximately June to August 2020, defendant recruited approximately 25 client-applicants and was paid approximately $500,000 by Simeunovic for the 12 to 13 client-applicants whose fraudulent EIDLs were approved by the SBA

Additionally, at the direction of Simeunovic, defendant also assisted Maja Nikolic in preparing and submitting fraudulent EIDL applications sought by other client-applicants, typically at Simeunovic's SIM Express office in Oak Brook, Illinois. During the summer of 2020, defendant and Maja Nikolic paid to reinstate dissolved, Florida-based companies using other individuals' personal information (such as birthdates and social security numbers); sometimes obtained Employer Identification Numbers (EINs) from the IRS for those companies; and filed forms with the Florida Secretary of State that falsely identified the recruited applicants as officers and agents of those companies. Defendant and Maja Nikolic knew that these companies were not in operation at the time they paid to reincorporate them, that the former owners of the companies had not authorized them to reincorporate or assume responsibility for those companies, and that they (defendant and Maja Nikolic) had no intention to initiate or resume any business operations under those companies' names.

After reincorporating these shell companies, defendant and Maja Nikolic used the personal identifying information of individuals who had agreed to pay Simeunovic and Maja Nikolic to prepare and submit fraudulent EIDL applications on their behalf through use of those shell companies. Defendant and Maja Nikolic prepared and submitted to the SBA EIDL applications that falsely and fraudulently represented that (1) the recruited individuals were the owners of the previously dissolved entities; (2) those individuals had assumed ownership of those companies more than one year before the dates on which defendant and Maja Nikolic had paid to reincorporate those

5

companies; (3) the shell companies employed specified numbers of employees as of January 31, 2020; and (4) those companies had earned and incurred gross revenues and costs in the 12 months prior to January 31, 2020.

Defendant knew at the time he and his sister submitted these applications that neither they nor the recruited client-applicants owned or had any relationship to these companies prior to the date they paid to reincorporate them; that the former owners of the companies had not authorized them to assume ownership or responsibility for those companies at any time; that these companies were not in operation; that the applying entities did not have any employees as of January 31, 2020; and that, during the 12 months prior to January 31, 2020, the shell companies neither earned nor incurred the revenues and costs of goods stated in the applications. In some instances, to substantiate their false representations regarding the shell companies' revenues, expenses, and continued existence, defendant and Maja Nikolic submitted, and caused to be submitted, to the SBA copies of falsified federal corporate income tax documents, knowing that the documents had been falsified.

In several of these EIDL applications, defendant falsely and fraudulently represented that the applicants were U.S. citizens. In those instances, defendant knew when they submitted the applications that the applicants were not U.S. citizens and falsely misrepresented their citizenship to evade additional scrutiny, from the SBA, of their false and fraudulent applications.

6

In order to complete and submit the fraudulent applications, defendant met with the applicants, gathered and recorded their personal information (such as name, date of birth, social security number, contact and bank account information), tracked the status of their fraudulent applications, and communicated with the applicants when additional information was needed and when EIDLs were approved. In some instances, at his direction, co-defendant Sumakovic assisted defendant in creating business email accounts and passwords for the shell companies, as well as executing other administrative tasks, so that defendant could submit fraudulent EIDL applications in a timely manner.

Within days of submitting each fraudulent EIDL application, defendant, Sumakovic, Maja Nikolic, and other co-schemers opened and caused others – such as their clients – to open a business bank account in the name of the shell company identified in that application. Defendant and his co-schemers directed the SBA to deposit the proceeds of fraudulently obtained EIDL loans into those bank accounts. Once the EIDL proceeds were received from the SBA, defendant caused the co-schemers' 50% share of the proceeds to be transferred to an account controlled by Simeunovic.

As part of the scheme, for his own personal benefit, on or about June 23, 2020, defendant reincorporated a previously dissolved Florida-based company called "Food by Orange," and caused information to be submitted to the Florida Secretary of State that falsely identified defendant as an agent of the company. On or about June 23, 2020, defendant submitted to the SBA a false and fraudulent EIDL application on

7

behalf of Food by Orange. In this application, MARKO falsely and fraudulently represented that he was the owner of Food by Orange; that Food by Orange employed 36 individuals as of January 31, 2020; that the company had earned approximately $1,570,000 in gross revenues in the 12 months prior to January 31, 2020; and that the company had incurred approximately $660,000 in cost of goods sold in that same period. Defendant knew at the time he submitted this application that these facts were false.

SBA subsequently approved the Food by Orange EIDL application. On or about June 29, 2020, defendant caused the SBA to disburse approximately $149,900 from the Federal Reserve Bank to a Food by Orange account maintained at Chase Bank, ending in 9036 and controlled by defendant, which funds represented the proceeds of the EIDL to Food by Orange. Defendant also obtained another fraudulent EIDL in the amount of $150,000 from the SBA for a shell company called Agrovet Solutions in a substantively identical fashion in July 2020.

Through his own fraudulent EIDL applications, recruitment of applicants for the scheme, and assistance in the preparation and submission of more than 100 fraudulent EIDL applications for others, defendant fraudulently sought to obtain approximately $17,700,000 in EIDL loans to which he and his co-schemers were not entitled. Not all of the loans that defendant sought to obtain fraudulently were approved by the SBA. The actual loss resulting from defendant's conduct is approximately $6,967,000, based upon the SBA's approval of approximately 46

EIDLs. Ex. A.[1] Defendant converted fraudulently obtained EIDL proceeds that he received personally in numerous ways, including approximately $200,000 for the purchase of a 2019 Lambourghini Urus which defendant exported to Serbia. PSR, ¶ 90, 95.

*Money laundering*

Throughout the scheme, defendant conducted financial transactions involving proceeds of the EIDL fraud scheme that were intended to conceal and disguise the location, source, ownership, and control of the funds. In some instances, defendant caused the SBA to disburse fraudulently obtained EIDL proceeds into bank accounts that he controlled and opened in the name of a shell company, quickly withdrew the fraudulently obtained proceeds through wire transfers or cashier's checks, then deposited the funds into other bank accounts that he controlled. In some instances, defendant transferred the fraudulently obtained EIDL proceeds to bank accounts controlled by Maja Nikolic, then directed Maja Nikolic to transfer portions of those proceeds to other financial accounts that defendant controlled. In other instances, defendant arranged for the SBA to deposit fraudulently obtained EIDL proceeds into bank accounts controlled by other co-schemers and third parties, then directed those individuals to transfer approximately 50% of those proceeds into bank accounts that Simeunovic controlled. Simeunovic then transferred portions of those proceeds to

---

[1] This figure is $320,000 greater than that provided in the Government's Supplement to its Official Version of the Offense, dated November 28, 2023. In preparing its sentencing memorandum, the government noticed that losses associated with the first two EIDLs defendant obtained through fraudulent means – for BG Cargo LLC and I-Truck Logistics, Inc., had been inadvertently omitted from the actual loss summary provided on November 28, 2023. To correct this error, Exhibit A includes losses associated with those loans.

9

various bank accounts controlled by his co-schemers, including defendant, Maja Nikolic, and others.

After accumulating EIDL fraud proceeds in U.S.-based bank accounts that he controlled, defendant transmitted portions of those proceeds in bulk increments to international accounts outside the United States. For example, by on or about July 14, 2020, defendant had accumulated more than $600,000 in fraudulently obtained EIDL proceeds in Citibank account ending in 0043. As charged in Count 32, on or about July 14, 2020, defendant caused approximately $600,000 to be wire transferred from Citibank account 0043, an account defendant controlled, to a bank in Serbia, namely, Raiffeisen Banka, A.D., to an account ending in 7956, for the benefit of Individual A. At the time he caused the transaction, defendant knew that the $600,000 consisted entirely of proceeds derived from the wire fraud scheme.

In total, between approximately May 29, 2020, and October 20, 2020, defendant transmitted and transferred approximately $3,446,030 in wire fraud proceeds from the United States to Serbia through wire transfers. During the same approximate time period, defendant's sister and co-schemer, Maja Nikolic, transferred approximately $7.45M of fraud proceeds abroad, and co-defendant Simeunovic transferred approximately $4.6M abroad.

Defendant knew from his personal experience, the large amounts of money involved, and the rapid movement of that money between accounts following its deposit by the SBA, that the proceeds that he transmitted and transferred, and attempted to transmit and transfer, were derived from the EIDL fraud scheme.

Defendant transmitted and transferred the fraud proceeds in this manner, and out of the United States, because he wanted to hide his ownership and his control of the proceeds, as well as the nature, location, and source of the proceeds, from law enforcement.

## II. Defendant's cooperation

After he was charged, defendant proffered with the government. During those discussions, defendant explained his role and the roles of others in the fraud scheme, and the manner in which he used a notebook to track more than 100 fraudulent EIDL applications submitted on behalf of co-schemers. Defendant testified in the grand jury, and agreed to testify against co-schemers at trial. Defendant has also made efforts to repatriate stolen fraud proceeds. Defendant indicates that his efforts to liquidate to assets in order to pay restitution are ongoing. PSR at ¶¶ 90 – 91, 96; Def. Sentencing Memo at 8 – 9.

## III. Objection to the Presentence Investigation Report

The government agrees that defendant's adjusted offense level of 30, with a criminal history category of I, was correctly calculated by Probation. PSR at ¶¶ 25 – 41, and 48. The government agrees with Probation's conclusion that the recommended guideline range of imprisonment is therefore 97 – 121 months. PSR at ¶ 98. This calculation is based upon the offense level applicable to the money laundering count, pursuant to Guideline 3D1.3.[2]

---

[2] Guideline § 3D1.3(a) states that the offense level applicable when sentencing a defendant for Closely Related Counts is that applicable to the most serious offense in the Group, *i.e.*, the count with the highest offense level. In order to determine which has a higher offense level, the Court must determine the offense level for each count. USSG § 3D1.3(a), App. Note

11

The government objects, however, to the overly broad statement that no adjustment for a Role in Offense (USSG § 3B1.1) applies to the defendant. PSR at ¶ 35 ("the increase for role does not apply"). That statement is overly broad, at least as it pertains to the calculation of the offense level for the wire fraud conduct. In fact, in the very same paragraph of the PSR, Probation recognized that "defendant was [a] leader in the wire fraud scheme as he recruited others to apply for the fraudulent EIDL loans, directed their actions, and earned part of the proceeds of those loans." *Id*. Thus, if Probation had included its calculation of defendant's offense level for the wire fraud count (count 8) in the PSR, that calculation would have included – consistent with the government's position in the plea agreement and the Government's Version of the Offense ("GVO") – an upward adjustment pursuant to USSG § 3B1.1.[3]

The PSR should expressly clarify this point because applying USSG § 3B1.1 when calculating the offense level for Count 8 precludes defendant from a downward adjustment pursuant to USSG § 4C1.1 (Adjustment for Certain Zero Point

---

3. Because the money laundering count (count 32) had a higher offense level (33), than the wire fraud count (count 8 – which had an offense level of 32), the offense level for the money laundering count determines the USSG range of imprisonment when sentencing defendant for these two crimes. That does not mean, however, that defendant did not "receive" a § 3B1.1 upward adjustment. He did, because it was applied when calculating the offense level for count 8, the wire fraud offense.

[3] See Plea Agreement at ¶ 10(b)(1); GVO at 17 – 18. Notably, defendant did not argue in his sentencing memorandum that an upward adjustment pursuant to USSG § 3B1.1 for the wire fraud conduct is not warranted. Any such argument would be contrary to the law, which recognizes that recruiting participants and organizing their activities is sufficient to establish an aggravating role. *See*, *e.g.*, *United States. v. Dade*, 787 F.3d 1165, 717 (7th Cir. 2015)(aggravating role includes organizing others for purposes of carrying out the crime); *United States. v. Mendoza*, 576 F.3d 711, 717 (7th Cir. 2009)(recruitment of accomplices supports application of § 3B1.1).

12

Offenders). The § 4C1.1 reduction is available only if defendant "did not receive an adjustment under § 3B1.1 (Aggravating Role) and was not engaged in a continuing criminal enterprise, as defined in 21 U.S.C. § 848." Section 4C1.1(a)(10). Although defendant was not engaged in a continuing criminal enterprise, he *did* have – as Probation has found – an aggravating role in the wire fraud conduct. Because § 3B1.1 applied to defendant's conduct in committing the wire fraud offense, he is ineligible for the two-level reduction provided by § 4C1.1.

The defense appears to assert (Def. Sentencing Memo at 3) that because Guideline § 3D1.3(a) instructs the Court to use the offense level for the money laundering conduct when imposing sentence, defendant did not "receive" an aggravating role upward adjustment and is therefore eligible for § 4C1.1. Not so. First, as discussed above, defendant did "receive" an upward adjustment when the offense level was calculated for the wire fraud offense. Second, construing § 4C1.1 in this manner would produce an absurd result. Under the defense's interpretation, defendant's commission of a second offense – money laundering – would enable him to qualify for the § 4C1.1 reduction; one that he could not receive if he had committed the wire fraud offense alone. It would be illogical to interpret § 4C1.1 – a provision intended to provide relief to those engaged in less serious criminal conduct – in such a fashion.

The government's interpretation of the new provision is also consistent with Guideline § 1B1.1(a)(4), which requires the Court, in cases involving multiple counts of conviction, to "[a]pply the adjustments as appropriate related to victim, role, and

13

obstruction of justice from Parts A, B, and C of Chapter Three" *to each count* before applying Part D of Chapter Three to group the various counts and adjust offense levels accordingly. It is necessary to do so because the Court cannot reliably determine which of the multiple counts has the highest offense level if it does not calculate the offense level for each such count separately. USSG § 3D1.3(a), App. Note 3.

In conclusion, the government agrees that defendant's offense level is 30, and his criminal history category is I, resulting in a guideline range of imprisonment of 97 – 121 months. The PSR should be corrected to specify that defendant *did* receive an upward adjustment pursuant to Guideline § 3B1.1(b) when the offense level for the wire fraud count was calculated, and that defendant therefore is not eligible for the two-level reduction provided in Guideline § 4C1.1.

## IV. Imposition of sentence

### A. Custody

Shortly after Congress enacted the CARES Act to aid those weathering economic harm resulting from the Covid-19 pandemic, it became apparent that billions of those dollars were being siphoned away by opportunistic criminals. Stories of high-end sport vehicles purchased with funds deposited into the bank accounts of non-existent businesses frequently made headlines. Seeking to put money into the hands of millions quickly in the face of a public health emergency, the EIDL program was implemented by the government in a manner that relied to an extraordinary degree on applicants' honor and honesty, both as to their eligibility and their need for

14

the funds. Although many chose to abuse this lifeline, the figures associated with the crimes charged in this case were extraordinary.

As disturbing as it has been to witness such criminality, it is particularly disheartening to see this defendant – a foreign national who came to the U.S. seeking opportunity – pillage a relief program for those in need of government assistance. Although defendant has no criminal history points, he has previously taken advantage of other governmental programs. As he admitted in a sworn statement, defendant's marriage in the U.S. (PSR at ¶ 59) was a sham which he participated in only to gain immigration status fraudulently. Ex. B.

Although defendant may have at one time intended to settle in this country permanently, his participation in this staggering fraud scheme, and his transfer of nearly $3.5M in fraud proceeds to Serbia, show he pictured his future life abroad, enjoying the spoils of his crimes. Defendant profited enormously from his crimes – in part by enabling others to participate in the scam – and he spent the funds he received in a stereotypically lavish fashion, buying himself a Lamborghini, among other items.

In addition to the obvious (and staggering) financial loss, defendant's crimes also brought disrepute to the EIDL program, fueling distrust and cynicism as to the government's ability to effectively address economic crises. Considering all of these aggravating factors, a sentence within the properly calculated USSG range of 97 – 121 months would provide appropriate punishment, adequately recognize the seriousness of the offense, promote general and specific deterrence, and engender respect for the law.

In mitigation, however, once he was caught and arrested, defendant chose to cooperate with the government. As previously described above, defendant debriefed with law enforcement, made a statement to the grand jury, agreed to testify for the United States in other proceedings if necessary, and made efforts to address the large restitution obligation that will soon be imposed. As a result, the government anticipates it will make a 5K recommendation in favor of the defendant. Because, as indicated in the PSR, his efforts to locate and liquidate funds are ongoing, the government will make a more specific 5K recommendation at the time of sentencing.

### B.     Financial components

Defendant should be ordered to pay restitution to the SBA in the amount of $6,967,000. Ex. A. Once entered, the Clerk of the Court will apply any funds deposited by defendant with the Court against this judgment amount. Defendant must be ordered to pay a $200 special assessment. The government does not recommend imposition of a fine.

### C.     Supervised release

The government concurs in Probation's recommendation that two years of supervised release be imposed and agrees that the terms and conditions recommended in the PSR appear necessary to monitor the defendant's compliance with the Court's orders and the law, to promote officer safety, to reduce recidivism, to support defendant's reintegration into the community, and to protect the public.

## V. Conclusion

For the reasons set forth above, the government respectfully requests that the Court impose a sentence of incarceration, restitution in the amount of $6,967,000, and a term of supervised release of two years.

        Respectfully Submitted,

        MORRIS PASQUAL
        ACTING UNITED STATES ATTORNEY

By:   /s/ *Brian Hayes*
        BRIAN HAYES
        Assistant United States Attorney
        219 S. Dearborn, 5th Floor
        Chicago, Illinois 60604
        Brian.Hayes@usdoj.gov

Dated: January 17, 2023

## CERTIFICATE OF SERVICE

The undersigned Assistant United States Attorney hereby certifies that in accordance with Fed. R. Crim. P. 49, Fed. R. Civ. P. 5, LR 5.5, and the General Order on Electronic Case Filing (ECF), the attached document was served pursuant to the district court's ECF system as to ECF filers.

                                              By:    /s/ *Brian Hayes*
                                                        BRIAN HAYES
                                                        Assistant United States Attorney
                                                        United States Attorney's Office
                                                        219 South Dearborn, 5th Floor
                                                        Chicago, Illinois 60604
                                                        (312) 886-2447